UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
UNITED STATES OF AMERICA


                 -against-

                                             13 CR 777 (AJN)


TARIQ GILL
                   Defendant.
---------------------------------------------------------x



**MEMORANDUM OF LAW IN SUPPORT OF
TARIQ GILL'S MOTION TO REDUCE SENTENCE
PURSUANT TO 18 U.S.C. §3582(c)(1)(A)**




Randa D. Maher

MAHER & PITTELL, LLP
10 Bond Street, Ste 389
Great Neck, NY 11021
Telephone:  (516) 487-7460

*Counsel for Tariq Gill*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RELEVANT BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Offense Conduct, Conviction and Sentence  . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Mr. Gill's Extraordinary Post-Sentence Rehabilitation. . . . . . . . . . . . . . . . . . 7

        1.    Mr. Gill's Successful Educational Accomplishments . . . . . . . . . . . . . . 7

        2.    Mr. Gill's Successful Work Accomplishments . . . . . . . . . . . . . . . . . . . 8

        3.    Mr. Gill's 12 Month Redemption Plan . . . . . . . . . . . . . . . . . . . . . . . . . 11

    C.    Mr. Gill's High Blood Pressure and Prediabetes . . . . . . . . . . . . . . . . . . . . . . 12

    D.    Mr. Gill's Family History of Serious Medical Conditions and Illness  . . . . . . . 15

    E.    The Harsh and Inhumane Conditions Sustained by Mr. Gill as
          an Incarcerated Person . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    F.    The BOP's Denial of Mr. Gill's Compassionate Release Application . . . . . . . . 20

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    I.    Mr. Gill Has Standing to File a Motion for a Reduction of His Sentence
        ("Compassionate Release") and this Court Has Jurisdiction and
        Authority to Grant the Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    II.    There Are Extraordinary and Compelling Reasons Which Warrant the
        Reduction of Mr. Gill's Sentence to a Term Of Time Served . . . . . . . . . . . . . 22

        A.    The Impact of the COVID-19 Pandemic on Mr. Gill's Confinement . . 23

        B.    Mr. Gill's Current Confinement at USP Canaan Significantly
            Heightens His Risk of Contracting COVID-19 . . . . . . . . . . . . . . . . . . 27

C.      Mr. Gills's  Hypertension and Prediabetes, Coupled with His Family
         History of These Diseases, Places Him at Serious Risk from
         COVID-19 if he remains incarcerated. . . . . . . . . . . . . . . . . . . . . . . . . .  33

III.    Mr. Gill's Compassionate Release Is Supported by 3553(a) Factors . . . . . . . .  37

A.      Mr. Gill's Rehabilitation Has Been Extraordinary  . . . . . . . . . . . . . . .  37

B.      Mr. Gill Has a Release Plan That Ensures Both His Safety
         and the  Community's, and  Will Allow Him to Successfully
         Reintegrate into Society . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

C.      Under current law, Mr. Gill no longer qualifies as a Career
         Offender such that the sentence enhancement he received is
         not necessary to reflect the seriousness of the offense
         or promote respect for the law.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

EXHIBITS

## PRELIMINARY STATEMENT

We respectfully submit this Memorandum of Law on behalf of Tariq Gill, the defendant in the above referenced matter, in support of the instant motion for an Order granting the following relief:

1) A reduction of his sentence to time served pursuant to 18 U.S.C. §3582(c)(1)(A) ("Compassionate Release"); and

2) Any other relief the Court deems just and proper.

## INTRODUCTION

Tariq Gill, now 41 years old, is currently in custody at USP Canaan, where he continues to serve his sentence. Mr.Gill has been in federal custody for approximately eight and one-half years, since his arrest on September 4, 2013. Pursuant to the Federal Bureau of Prisons ( "BOP") website, Mr. Gill's scheduled release date is December 13, 2029. Accordingly, by our calculations, he has served approximately 55% of his sentence.

For the past two and one-half years, and through the present, Mr. Gill's incarceration has been negatively impacted by the advent and spread of the COVID-19 pandemic (the "Pandemic"), which continues to wreak havoc through multiple mutations. Consequently, for the past 28 months and counting, Mr. Gill has endured unimagined and severe hardships due to onerous conditions imposed by the BOP in response to the Pandemic. In addition, due to his underlying health conditions (hypertension and prediabetes) and his family's medical history, despite being vaccinated and boosted, Mr. Gill remains at risk of suffering serious medical complications if he contracts any of the current COVID-19 variants – including the highly contagious Omicron variant and its myriad and evolving subvariants circulating through the United States.

1

By this Motion, we contend there are factors which, either standing alone or in aggregate, constitute "extraordinary and compelling" circumstances warranting the Compassionate Release of Mr. Gill. Principally, these factors include:

(1)     The harsh and inhumane prison conditions Mr. Gill has endured for the past 28 months, and which continue for the indefinite future;

(2)     His increased risk of contracting a COVID subvariant as an inmate in a carceral setting like USP Canaan, notwithstanding vaccination;

(3)     Mr. Gill's underlying underlying health issues, compounded by his family's medical history;

(4)     Mr. Gill's extraordinary rehabilitation efforts, as evidenced by his prison progress reports, certificates of completion and reentry plan; and

(5)     The BOP's failure to provide Mr. Gill access to recommended educational opportunities which the BOP, itself, has identified are needed for his success upon release.

The above circumstances, coupled with consideration of the factors set forth in 18 U.S.C. §3553(a) – including Mr. Gill's classification as a Career Offender, based on state narcotics offenses which, pursuant to recent case law, are no longer valid predicates – justify granting this Motion and reducing the remainder of Mr. Gill's sentence to time served.

## RELEVANT BACKGROUND

### A.    The Offense Conduct, Conviction and Sentence

On October 8, 2013, Mr. Gill and two others were charged in a three-count indictment (the "Indictment"), alleging their participation, for less than two months, in two conspiracies. (See Dkt.

10).[1] The charges involved an agreement to possess and distribute cocaine and heroin, a second agreement to rob a purported shipment of cocaine and heroin coming from Miami, Florida, as well as possession of firearms during the narcotics offense. *Id.*

On March 21, 2014, in accordance with the terms of a written plea agreement dated March 13, 2014 (Dkt 182-1), Mr. Gill pleaded guilty to the following three offenses: (1) conspiracy to distribute or possess with intent to distribute 500 grams or more of mixtures and substances containing cocaine, and 100 grams or more of mixtures and substances containing heroin in violation of 21 U.S.C. § 846; (2) conspiracy to interfere with commerce by threats of violence in violation of 18 U.S.C. § 1951; and (3) possession of a firearm during and in relation to the narcotics offense in violation of 18 U.S.C. § 924(c)(1)(A)(I) (Dkt 50 at 8-9, 21-22, and Dkt. 88 at 1-2).

Following his guilty plea, and prior to his sentencing, the U.S. Probation Department prepared a Presentence Investigation Report, which was revised on August 19, 2014 (the "PSR"). While in no way intending to down-play the seriousness of Mr. Gill's illegal conduct, we note that, as reported in the PSR, the instant offense was a sting operation involving a proposed robbery of fictitious drug dealers. As such, there were no victims. Moreover, the investigation was not directed against Mr. Gill, but rather his co-defendant, John Cook, Jr., who was known to have previously committed armed robberies against drug dealers. *See* PSR ¶'s 15-16, 24.  Furthermore, as the PSR reports, including in the Criminal History section, from the time he was 10 years old, and up until his arrest for the instant offense, Mr. Gill had been a lifelong substance abuser, abusing alcohol, marijuana and Ecstasy, who was open to seeking help. *See* PSR ¶'s 53, 55, 57-59, 79-82. The PSR notes that "Gill

---

[1] Unless otherwise noted, numbers following "Dkt", refer to entries on the electronic docket for Mr. Gill's criminal case, assigned 13-cr-777.

described himself as a 'functional addict' because he was able to run his restaurant business while still using drugs. Gill expressed a willingness to re-enter a substance abuse treatment program." *Id.* at ¶82. Prior to his arrest in this case, Mr. Gill owned and operated a New Jersey restaurant and had six employees working for him. *Id.* at ¶ 86.

On August 20, 2014, this Court sentenced Mr. Gill to 224 months' imprisonment, which included a 60-month consecutive sentence for the firearms conviction.  Dkt. 88 at 3. The imposed sentence was based largely on the PSR's determination that Mr. Gill was a Career Offender, within the meaning of § 4B1.1 of the guidelines, who also was convicted of 18 U.S.C. § 924(c).  PSR ¶ 86. The PSR relied on three of Mr. Gill's prior state narcotics convictions in New Jersey in support of his Career Offender classification– specifically citing his two convictions for Distribution of a Controlled Substance on School Property in the Third Degree in Passaic County Superior Court, on January 26, 1999 and June 24, 2004. PSR ¶ 48.

In imposing Mr. Gill's sentence, this Court recognized his lifelong substance abuse, and acknowledged a "somewhat head-scratching tension" in reconciling the instant offense with Mr. Gill's prior record. The Court noted that Mr. Gill's criminal record "demonstrates a string of narcotics convictions. One violent conviction for threatening to kill someone, but absent is what I see in many cases which is substantial violent criminal history" (Dkt. 89 at 24). This Court continued:  "**I haven't seen consistent history of violence in your past, Mr. Gill**." (Dkt. 89 at 25) (emphasis supplied). Notably, six of Mr. Gill's eight adult criminal convictions included in the PSR involved narcotics offenses; four of those occurred between the ages of 17 and 25 years old. *See* PSR at ¶'s 53-59.  The Court observed that Mr. Gill's only prior "violent" offense (a NJ conviction for Threatens to Kill), occurred when he was 23 years old, for which he served three years' imprisonment. PSR at ¶ 57.

4

At his sentencing, in taking into account Mr. Gill's personal characteristics, this Court acknowledged that Mr. Gill "grew up under what may be considered extraordinarily difficult and no doubt challenging circumstances. He has and presumably continues to grapple with drug addiction. I think the materials [provided by defense counsel] in all suggest that **Mr. Gill is someone who is not beyond redemption.**" (Dkt 89 at 25-26) (emphasis added).

After considering Mr. Gill's acceptance of responsibility and candid statements of remorse, the Court told Mr. Gill:

> I think you are right not to give up on yourself. You are a smart man. You demonstrate that in your articulateness. You are well read. You are learning and you will continue to learn. **You don't give up on yourself. I will not give up on you.** I hope you will take the opportunity that will be given to you to make better choices in the future to support your family and not to make a choices that you've made away from your family in going forward. I have concern about that, but I did listen to you. **I trust that there is sincerity in what you are saying as you continue to accept responsibility for your actions and make better choices in the future.**

*Id*. at 26-27. (emphasis added).

In her pre-sentence submission, defense counsel emphasized that:

> ... **Tariq[ ] [Gill's] childhood is among the worst of the worst**. Besides brief periods with his grandmother before she died, there was not one person in Tariq's life that showed him even the semblance of love or affection ... Tariq's childhood was one wrought with physical abuse by drug addicted parents who treated him as an errand boy for their drug dealing and nothing more. Tariq has no memory of ever being hugged or touched with affection in any way by either of his parents. One of Tariq's earliest childhood memories is watching his father smoke crack in their living room. As Tariq's cousin, Tawan Lee, states in her letter to the Court, "I know firsthand the cruelty of how we grew up. We raised ourselves as kids not knowing right from wrong…".

Dkt. 76 at 16 (internal citations omitted) (emphasis added). [2]

---

[2] At sentencing, defense counsel reiterated that Mr. Gill's childhood was "one of the worst childhoods and lives that I have really ever come across."  Dkt. 89 at 9.

Additionally, as Exhibit H to her pre-sentence submission, defense counsel attached a "Pre-Sentence Memorandum" prepared at her request by The Osborne Association's Court Advocacy Services ("CAS"), and dated June 23, 2014. (Dkt. 76-15) (attached hereto as Exhibit A).  Based on interviews with Mr. Gill, and other family members, CAS confirmed that Mr. Gill "grew up in an extremely dire situation where from an early age he was exposed to drugs and violence and grew up as the child of an incarcerated parent." (Exhibit A at 2). Nonetheless, based on its own investigation, CAS opined that:

> Notwithstanding the serious charges for which Mr. Gill has pled guilty and his prior criminal justice involvement, **it is our opinion that he remains an individual with both the potential and desire to be a positively contributing member of his community**. **Indeed, he has redeeming qualities** such as being an involved parent and participating in programs to improve his decision-making, while also **showing the capacity and inclination towards pro-social behaviors during parts of his life**, particularly those periods when he was actively employed and involved in the lives of his children.

*Id.* (emphasis supplied). CAS recommended that Mr. Gill be sentenced to a minimum term of 10 years, because: "we believe that Mr. Gill is worthy of this lenient disposition, which will ensure that he not only repays his debt to society, but that he is able to return to the community in a timely manner in order to get his life back on track and resume his noble efforts as a loving husband and father, and being an asset to his community." Exhibit A at 3.

At sentencing, Mr. Gill addressed the Court  and, among other things, took responsibility for his actions and expressed remorse for his conduct. (Dkt. 89 at 12-13). He recognized his bad judgment in choosing "criminality" over law-abiding behavior and promised the Court that he was "never going to give up on myself" and would continue "trying or attempting to become the man that I know I am." *Id.* at 21.  As demonstrated below, Mr. Gill has kept his promise.

**B.** __Mr. Gill's Extraordinary Post-Sentence Rehabilitation__

Prior to his transfer to USP Canaan, which occurred during the Pandemic, Mr. Gill was housed at FCI Raybrook through approximately the end of 2020. As he intended, Mr. Gill sought to use his time in prison as productively as possible. He has been successful in doing so – both through educational opportunities and prison jobs.

*1.    Mr. Gill's Successful Educational Accomplishments*

While at Raybrook and up through the beginning of the Pandemic, Mr. Gill completed education courses in an array of academic topics, including history and science.

The Summary Reentry Plan - Progress Report (the "Reentry Plan") (attached as Exhibit B), indicates that Mr. Gill obtained his GED at Raybrook and completed the following self-study courses:

> WWI History
>
> Space Address Science Course
>
> Continental Drift Science Course
>
> African American History
>
> Hands On Banking (2 parts)
>
> Fair Shake Resources Info

*Id.* at 2. Since arriving at USP Canaan, Mr. Gill has completed "Introduction to Recreation." *Id.*

As the corresponding Certificates of Completion evidence (Exhibit C), Mr. Gill also completed courses in: (1) Drug Education, (2) Non-Residential Drug Abuse Program, and (3) Lower Back Class. These Certificates acknowledge that Mr. Gill has demonstrated "an ongoing commitment to personal Growth and development through continuing education." *Id.*

The BOP has recommended that Mr. Gill take classes in Parenting, CDL, OSHA and VT Culinary Arts. (Exhibit B at 2). And the Reentry Plan further recommends that Mr. Gill, "[i]n

preparation for release, employment and reintegration into the community ... complete courses in six core topics in the Release Preparation Program." along with the CDL and OSHA classes, "to assist with securing employment upon release." *Id.* at 3.  However, upon information and belief, Mr. Gill has been unable to complete any additional recommended course work at Canaan due to the prison's failure to offer these, or other, classes during the Pandemic. Consequently, Mr. Gill's incarceration for the past twenty-eight months of the Pandemic has foreclosed him from pursuing educational opportunities for further personal growth and development – and continues to do so.

### 2. *Mr. Gill's Successful Work Accomplishments*

#### a. <u>FCI Raybrook</u>

While at Raybrook, in addition to using his time to educate himself, Mr. Gill worked in the facility's food services as a cook, on average for 7-8 hours a day, and sometimes more. Mr. Gill's responsibilities initially included cooking for the other inmates. But due to his culinary talents, he later was assigned as lead line cook in the Correction Officers' Mess Hall.

Mr. Gill's Work Performance Ratings (the "Ratings") periodically review his work, often on a monthly basis, between January, 2015 and July 2021, including during the Pandemic. (Attached as Exhibit D).  Overall, these Ratings demonstrate that, for the approximate six and one-half years that Mr. Gill worked as a cook at Raybrook, he excelled at his job. Mr. Gill's ability to learn was often recognized as outstanding. He required little to no supervision, responded well to instruction and made efforts to improve when asked. He was friendly, congenial and helpful when working with others and highly proficient at cooking and cleaning up. *Id.* at 1- 28, 30, 35, 36.

For example, Mr. Gill's Bonus Justification in his Rating from July 2015, describes him as an "outstanding cook, knows recipes, always prepared." *Id.* at 54. His December 2015 Rating, which

again justifies a bonus, notes: "Did excellent work this month. Worked very hard during holiday week." *Id.* at 51. The Bonus Justification in Mr. Gill's January 2016 Rating states: "Excellent worker. Keeps kitchen clean and organized at all times." *Id.* at 50. His February 2016 Rating justifies yet another bonus, noting, "Does great work.  Works with staff to create high quality food for others." *Id.* at 49. Again, in March 2016, his Rating's Bonus Justification states: "Excellent cook. Does a great job on the food for OM[3]. Will do whatever is asked of him." *Id.* at 48. Similar comments in support of bonuses for Mr. Gill consistently continued throughout the next five years, and are found in myriad Ratings, including: April and May 2016; November 2017; June, July, August and December 2018; January, March, April, May, June, August, September, October, November and December 2019; and January, February and March 2020. *Id.* at 5 -23,  29, 31, 32, 34, 46-47.

Notably, Mr. Gill continued working in the kitchen during COVID, 7-days a week, as acknowledged in the Bonus Justification contained in his May 2020 Rating, during which time the quality and quantity of his work, along with his initiative and interest remained "outstanding". *Id*. at 4. The following month, in June 2020, Mr. Gill's Bonus Justification noted: "This inmate works extremely hard. He produces high quality meals in the staff OM.  He also helps out wherever he is needed. Works Seven days a week during Covid Pandemic." *Id.* at 3.  His Rating from June 2021, approximately one year later, reflects his promotion to lead cook and states: "As it's Gills 2nd month here in Food Svc as lead cook, he has taken huge responsibility in all actions of his job in everything he does and makes sure every task is completed and keeps a very clean work station and helps train his coworkers on how to mass  produce cook." *Id*. at 2. The final Rating, for the July 2021 evaluation period, notes that: "inmate Gill continues to strive for doing the right thing as the lead line cook. From

---

[3]Upon information and belief "OM" refers to Officers' Mess or Staff dining.

counting out all the portions to fulfilling the needs of the line he completes his job 110%. Keep up the good work." *Id.* at 1.

Attached as Exhibit "E" are copies of menus utilized by Mr. Gill for the Officers Mess over several weeks, as well as three recipes. The creativity and sophistication of the cuisine Mr. Gill prepared for the Officers Mess at Raybrook demonstrates the extent of his culinary talents and explains why his Ratings were so outstanding. For example, on Officers Mess Week 1, Mr. Gill prepared meals featuring dishes from a different country each day: Monday - Americana, Tuesday - Mexican, Wednesday- Italian, Thursday - Soul Food and Friday - Asian. *Id.* at 1. As noted, each meal offered a smorgasbord of dishes (poultry, beef and vegetarian). His other menus (Weeks 2 and 3) featured a wide variety of dishes, including soups and entrees, and a salad bar, with home-made salads, for each meal. *Id.* at 2-3. Mr. Gill's recipes – Buttery Chicken Breast with Lemon and Capers; Sauteed Vegetable Medley with Teriyaki Sauce, and Shrimp Scampi with California Rice – demonstrate his expertise in planning and preparing these meals as well as his potential to be a great chef upon his release from prison. *Id.* at 4-8.[4]

### b.   USP Canaan

Since being transferred to USP Canaan in early 2021, Mr. Gill has found himself not only without educational opportunities, but, until a few months ago, also without employment opportunities, due in large part to restrictions relating to the Pandemic. However, as the Reentry Plan states, Mr. Gill "is currently assigned to the following work detail: USP PLUMBING ALL DAY. He

---

[4]As mentioned earlier, prior to his arrest in this case, Mr. Gill owned and operated a New Jersey restaurant and had six employees working for him. PSR at ¶ 86. As stated in Mr. Gill's "12 Month Redemption Plan," discussed supra, one goal, upon his release, is to own and operate a food truck. (*See* Exhibit F).

has gained employable work skills through his employment in the Federal Prison." Exhibit B at 2.[5]

Upon information and belief,  Mr. Gill's plumbing work involves fixing showers, leaking sinks and

toilets and unclogging drains in food service.  He also works with gas, water heaters and stoves.

While Mr. Gill had no prior experience in plumbing, he was always interested in this field and has

learned much on the job.  Upon further information and belief, Mr. Gill is one of only nine inmates

who perform plumbing for the entire facility; he and eight others are divided into three crews, with

three inmates per crew.  He works Monday through Friday, from 8:00 a.m. until 2:00 p.m., with a day

off every other Friday.

### 3.    *Mr. Gill's 12 Month Redemption Plan*

Mr. Gill has prepared a "12 Month Redemption Plan" in which is describes his plans to build

his "business and self back up from ground zero" in a twelve-month period upon his release.

(Attached as Exhibit F). His first plans are to obtain his driver's license and look for a job.  "Having

a steady source of income is always a plus, it also serves as a way for me to minimize leisure time

which in my case never amounted to anything positive on a consistent level."   He then intends to

"purchase a good used food truck." He will then identify and acquaint himself with the various food

distributors from whom he will need to purchase supplies, and establish "a sound and reliable

agreement with multiple sources who can supply my demand at a fair price to me whereas I can

reflect that same fairness onto my customers."  Mr. Gill's next step in seeing his business to fruition

"is figuring my routes, popular places and unchartered areas in which my venture can thrive off.  The

pleasure of the food trucking business is that you can establish a loyal clientele as well as capitalize

---

[5]Upon information and belief, prior to working as a plumber, Mr. Gill had worked for a
few months in the kitchen at Canaan but was rotated out to allow another unit to learn the job.

on being in the right place at the right time."  As final steps, Mr. Gill notes he will "have to procure occupancy permits, board of health codes, OSHA and shelve-safe regulations to legally operate my truck.  Once I have that all in order I can then use social media as a platform to not only advertise and promote my business but to also set up a GPS tracker as to allow my customer and potentials to pinpoint my actual location in real time."

Mr. Gill concludes his plan with unequivocal optimism:

> *I honestly believe that given the opportunity to reclaim my freedom, with my renewed way of thinking, I can and will be amongst the productive and successful citizens of my time. All I need is a little faith entrusted in me and some others to adopt my "I know I can" approach .*

## C.   <u>Mr. Gill's High Blood Pressure and Prediabetes</u>

Mr. Gill entered prison without any diagnosed medical conditions (*see* PSR at ¶ 's 75-77).[6] However, since his incarceration, Mr. Gill's health has declined. He has developed high blood, specifically Stage 2 hypertension.[7] (Copies of select portions of Mr. Gill's medical  records are attached as Exhibit G). As the Mayo Clinic warns, "[e]levated blood pressure tends to get worse over time unless steps are taken to control blood pressure." [8] Treatments for stage 2 hypertension, like Mr.

---

[6]The PSR notes only that Mr. Gill suffered "dizzy spells, blurred vision, and a diminished sense of smell" as a result of a bar fight in 2010. PSR at ¶ 76.

[7] According to the Mayo Clinic, "Stage 2 hypertension" is defined as "a systolic pressure of 140 mm Hg or higher or a diastolic pressure of 90 mm Hg or higher." In other words a blood pressure range of 140/90 or higher. Mayo Clinic, Patient Care & Health Information, Diseases & Conditions, "Elevated blood pressure" https://www.mayoclinic.org/diseases-conditions/prehypertension/diagnosis-treatment/drc-20376708 (last visited July 29, 2022).

[8]*Id.*

Gill's, include medications and healthy lifestyle changes.[9]  However, as an incarcerated person, Mr. Gill's ability to make such necessary lifestyle changes has been severely hindered. Additionally, upon information and belief, many of the prescribed medications have made him sick, and health services providers do not automatically follow up with him after prescribing new medications. Often, Mr. Gill has waited weeks to see or follow up with a health care provider at the prison. To do so, he first must submit a request and then wait weeks to get on a list. The frequent need for treatment adjustments have left Mr. Gill feeling like a "guinea pig."

According to a Clinical Encounter dated February 3, 2022, Mr. Gill takes the following three medications for his hypertension: (1) Metoprolol Tartrate tablet,50 mg Orally, twice daily;[10] (2) amLODIPine, 10 mg orally, once per day;[11] and (3) Losartan potassium,50 mg tablets, one and one-half tablets orally, once per day.[12] "Lowering high blood pressure helps prevent strokes, heart attacks, and kidney problems."[13] Mr. Gill's Medication Orders indicate that his prescriptions for both

---

[9]*Id.*

[10] Metoprolol is a beta blocker which is used to treat high blood pressure (hypertension) and chest pain (angina). WebMD, Metoprolol Tartrate - Uses, Side Effects, and More. https://www.webmd.com/drugs/2/drug-11207/metoprolol-tartrate-oral/details (last visited July 29, 2022).

[11]amLODIPine is a calcium channel blocker that is also used to treat hypertension and angina. Mayo Clinic, Drugs and Supplements, Amlodipine (Oral Route) https://www.mayoclinic.org/drugs-supplements/amlodipine-oral-route/description/drg-20061784 (last visited July 29, 2022).

[12]Losartan is an angiotensin receptor blocker used to treat high blood pressure and to protect kidneys from damage due to diabetes. WebMD, Drugs & Medications, Losartan Potassium - Uses, Side Effects, and More. https://www.webmd.com/drugs/2/drug-6616/losartan-oral/details (last visited July 29, 2022).

[13] *Id.*

13

Metoprolol Tartrate and Losartan potassium represent increased dosages, required to address his elevated blood pressure, which at this visit was recorded as 166/85. (Exhibit G at 1 and 2).[14]

In addition to his Stage 2 hypertension, since being imprisoned, Mr. Gill has been diagnosed with prediabetes, a condition that raises his risk of diabetes type 2. Upon information and belief, his most recent Hemoglobin A1C level was 5.7, which falls in the prediabetes range.[15]   Upon further information and belief, following his diagnosis, Mr. Gill was given a dietary regimen to follow but cannot access the requisite foods in prison. Moreover, while the American Diabetes Association indicates that an A1C test should be repeated twice a year,[16] upon information and belief, Mr. Gill's A1C was last tested more than six months ago. The Mayo Clinic advises that "[h]ealthy lifestyle choices can help you bring your blood sugar back to normal, or at least keep it from rising toward the levels seen in type 2 diabetes."[17] A "healthy lifestyle" consists of eating "[a] diet high in fruits, vegetables, nuts whole grains and olive oil", and engaging in "at least 150 minutes of moderate or 75 minutes of vigorous aerobic activity a week, or a combinatino of moderate and vigorous exercise."[18] Mr. Gill's imprisonment, along with restrictions and lockdowns for more than the past two years,

---

[14] Upon information and belief, results from and a January 2022 blood test found his blood pressure further elevated, to 168/98.

[15] American Diabetes Association, Diabetes Overview, Understanding A1C. https://www.diabetes.org/diabetes/a1c  (last visited July 29, 2022).

[16] *Id.*

[17] Mayo Clinic, Patient Care & Health Information, Diseases & Conditions, Prediabetes, Treatment. https://www.mayoclinic.org/diseases-conditions/prediabetes/diagnosis-treatment/drc-20355284 (last visited July 29, 2022).

[18] *Id.*

14

have prevented him from eating the required diet, engaging in adequate physical activity and properly monitoring his condition.

Finally, as reported in Mr. Gill's medical records, it appears he also suffered from cardiac issues including an abnormal EKG. (Exhibit G).

In an attempt to protect himself from serious complications should he contract COVID-19, Mr. Gill was vaccinated with two shots of Moderna – now more than one year ago, on May 24, 2021 and June 22, 2021. He also received a Moderna booster on January 12, 2022 – 7 months ago.  As discussed below, unfortunately, these shots do not prevent him from contracting the highly contagious subvariants of the Omicron mutation or suffering serious medical complications, if he does.

**D.     Mr. Gill's Family History of Serious Medical Conditions and Illness**

Upon information and belief, many of Mr. Gill's immediate family members suffer from the same serious medical conditions that he does.  Some have even died from these conditions. Upon information and belief, his mother, Tonya Marie Gill, has both diabetes and high blood pressure. Her mother, and Mr. Gill's grandmother, Reva Mae Gill, now deceased, suffered from diabetes and kidney failure. On his father's side, Mr. Gill's aunt, Cynthia Scott, also deceased, suffered a heart attack and heart failure. His other paternal aunt, Geneva Scott, is a diabetic. Several other members of Mr. Gill's father's family, are deceased, for causes unknown, possibly related to these same medical conditions.

**E.     The Harsh and Inhumane Conditions Sustained by Mr. Gill as an Incarcerated Person**

Mr. Gill is currently housed at USP Canaan, a high security federal prison in Pennsylvania with a reputation for violence. For example, on June 1, 2021, two inmates were indicted for assaulting

another individual with a sharp object and a combination lock wrapped in a bedsheet.[19]  Months later, in October of 2021, another inmate was found non-responsive and later determined to be dead.[20] One month after, in November of 2021, an inmate at Canaan was killed in a fight with another prisoner.[21]

At USP Canaan, Mr. Gill is assigned to Unit E, located in a one-story building together with five other units (A, B, C, D and F). Not everyone in his unit is vaccinated. Heat and central air-conditioning circulate throughout the building. Mr. Gill wakes up each morning in a cell measuring approximately 6 feet wide and 16 feet long, which he shares with another inmate. The cell contains two beds, a small table, two lockers, a toilet and a sink; there is no access to fresh air in the unit.

Masks are not mandated or regularly worn by the inmates at Canaan, or the staff.  There is no hand sanitizer because of its alcohol content and inmates are required to purchase their own soap. Upon information and belief, the facility has not conducted routine COVID testing since approximately May of 2021. Rather, inmates are tested only after they are symptomatic or someone

---

[19]The United States Attorneys Officer, Middle District of Pennsylvania, Two USP Canaan Inmates Charged with Assault and Possession of a Weapon. June 2, 2021. https://www.justice.gov/usao-mdpa/pr/two-usp-canaan-inmates-charged-assault-and-possession-weapon (last visited July 29, 2022).

[20] Melissa Lee, Tri-County Independent. Inmate death reported at USP Canaan. Oct.1, 2021. https://www.tricountyindependent.com/story/news/2021/10/01/inmate-found-unresponsive-sept-28-usp-canaan-according-release-issued-u-s-department-prisons/5946174001/ (last visited July 29, 2022).

[21] Michael Balsamo. ABC News. Third Inmate killed in new spate of federal prison violence. Dec. 6, 2021. https://abcnews.go.com/Politics/wireStory/inmate-killed-spate-federal-prison-violence-81597280 (last visited July 29, 2022).

in their orbit tests positive. Nor are there social distancing rules in place. To those on the inside, it appears (quite falsely) that COVID is no longer a threat.

However, due to restrictions issued in response to the Pandemic, educational classes are still shut down. While restrictions presently have relaxed in some ways, for most of the Pandemic, Mr. Gill was forced to live locked down in his cell, on a regular basis, for close to two years. He would go to the mess hall, pick up his breakfast and bring it back to his unit, which houses approximately 104 inmates. Lunch came on a cart, with dinner picked up by each inmate and brought back to the unit. The unit's common area contains five tables, each with four seats, allowing for only 20 of 104 inmates to be seated and eat their meals.[22] Due to such inadequate common space, most of the inmates wind up eating in front of their cell or inside their cell.

Depending on the weather and the operations level (e.g., code red requires "intense modification"), Mr. Gill might have an option to go to the yard for recreation.[23] The yard is shared by two units, approximately 100 to 200 inmates who are unmasked and not socially distancing. As Mr. Gill's recreation schedule conflicts with his meal time or work time, exercise has become a choice he must make.

Aside from the outdoor recreation option, the leisure rooms on the units remain closed. Someone from "recreation" comes by once a week with a package of self-study materials on a variety

---

[22]Upon information and belief, each of the five tables is "owned" by a distinct group of inmates, based on race or other affiliation. Consequently, Mr. Gill is limited to sitting at the table with other black inmates.

[23]Upon information and belief, until recently, he had access to recreation, 4 x a week for one hour; however, because these times conflicted with meals and work, he now has to choose.

of topics. As noted earlier, Mr. Gill has availed himself of this opportunity to the extent possible. However, these packets do not include the educational courses recommended in the Reentry Plan.

Presently, visitors are allowed but most do not wear masks. While the operational level at Canaan is currently "Level 2" (yellow),[24] for much of Mr. Gill's time there, it has been "Level 3" (red).[25] According to BOP regulation, Level 2 Operations state: "**Modifications not necessary if social distancing is followed**.  Per DOJ guidance, **face covering required – for inmates and staff – at all times in all indoor environments**. Face covering required when social distancing is not possible outdoors.  **Social distancing is required in all areas.**[26]  (emphasis supplied). From this guidance, it is clear that BOP is not following its own COVID-19 procedure and protocols at USP Canaan, and in doing so is placing inmates, like Mr. Gill, at risk of infection and serious health complications.

In a letter prepared by Mr. Gill, dated November 21, 2021, he describes the utterly irresponsible manner that the BOP responds to COVID cases at USP Canaan, particularly the differing treatment of inmates compared to staff. (Attached as Exhibit H). In his letter, Mr. Gill

---

[24]Federal Bureau of Prisons. USP Canaan. Level 2 Operations. Operations are being modified at this facility due to COVID-19. https://www.bop.gov/locations/institutions/caa/ (last visited July 25, 2022).

[25] As explained by the BOP, "Institutions determine their operational level and modifications based on the facilities' COVID-19 medical isolation rate, combined percentage of staff and inmate completed vaccinations series, and their respective county transmission rates." The lowest level is green (level 1), the mid level is yellow (level 2) and the highest is red (level 3). Levels may vacillate over 48 hour periods based on medical isolation rate, facility vaccination rate, and community transmission rate.  Level yellow requires a facility vaccination rate of 50% but less than 65%. Federal Bureau of Prisons, *COVID-19 Modified Operations Plan & Matrix*. https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (last visited July 25, 2022). Upon information and belief, yellow is the current level at Canaan.

[26] *Id.*

18

recounts how, approximately eighteen months after the Pandemic had been in existence, the BOP first

insisted a sick inmate had pneumonia before later admitting that he had both pneumonia and COVID.

> *Anyway Friday morning they locked us down and did a test of the unit. And not surprisingly 5 other inmates tested positive one happened to be next door to me, Room #123 and another room #122... They immediately locked us down for quarantine. The issue here is the differential treatment. When a staff member test positive, one who we share the space with. These same protocols are not introduced. The blatant disregard to our safety (inmates and public) that BOP exhibit is grossly negligent, and for them (BOP) to state that they (BOP) are capable of properly handling this pandemic would be laughable had my life along with those incarcerated with me not be at stake. Not to mention the public safety factor. Considering when I was sentenced, death wasn't a possibility that was part of the sentencing agreement.*

Mr. Gill also documents BOP's mishandling of the situation created by the Pandemic,

including it's lack of preparedness and failures to follow its own protocols. He maintains that "The

'Actual' number of infections inside do not reflect the numbers posted on BOP website" and labels

the same as "fraudulent data" used by courts to deny compassionate release motions. Mr. Gill also

describes how, while newly arrived inmates must quarantine for 21 days and provide two negative

Covid tests before they can interact with the prison's general population, similar precautions do not

apply to prison staff.

> *...[W]hen it comes to staff, they have total mobility of the jail. Freedom to roam as they please, the ability to object to mask wearing without fear of consequence. Unlike the inmates, staff here defy each and every guideline recommend or proposed by CDC. Then when questioned as to why we have to wear masks and they don't, they respond, "their not inmates."  The vaccination status of staff is secretive, but some staff have no issue expressing their displeasure about being "vaxxed." ... To add insult to injury, these same guards are understaffed, and overworked.  And this goes to the heartbeat of BOP's claims of "Adequately" being able to handle COVID-19.  If the main objective is to mitigate and control the spread, these efforts will always be futile. I think non-accomplishable would describe these efforts better. I say this because that same staff member who just worked the "contaminated zone" today, is expected to work a non contaminated one this afternoon. No PPE, no mask, no decontamination shower, no guidelines what so ever to intervene a "guardian" who clearly has been in the area of exposure from*

19

*preventing them to exposing others. No logical sense whatsoever. Lastly, I want to shed light to this. BOP here works on defense. Instead of doing wellness checks or staff reporting someone who looks ill, their expectation is for you to report yourself that you feel sick or your neighbor isn't looking too well. There is no honor amongst thieves. Secondly, these people here feel that by doing so, it's a punishment attached to that. 21 day quarantine is hell. No visits, no phone calls, no emails, maybe a shower, maybe not ... Did I not mention 24 hours locked in your cell. Doing time is already hard, so to expect someone whose not sick to impose these things on themselves is not "logically" thinking..... To conclude this, we are in danger here and the people who are here to make sure that we are safe, in my opinion they are way in over their heads and don't know how to say this. They either are too embarrassed to let on that they need assistance or they just don't care. ...*

(Exhibit H).

**F.     The BOP's Denial of Mr. Gill's Compassionate Release Application**

Mr. Gill's Request for Remedy was denied by the Warden at USP Canaan on April 30, 2021, essentially because he was serving a sentence for a crime of violence and did not have either a "terminal medical condition" or a "debilitating medical condition." (*See* letter attached as Exhibit I).

## DISCUSSION

**I.     MR. GILL HAS STANDING TO FILE A MOTION FOR A REDUCTION OF HIS SENTENCE ("COMPASSIONATE RELEASE") AND THIS COURT HAS JURISDICTION AND AUTHORITY TO GRANT THE MOTION**

The First Step Act of 2018 ("FSA") modified 18 U.S.C. §3582(c)(1)(A)(i). Previously, under this statute, only the Bureau of Prisons ("BOP") could file a petition before a district court requesting a reduction, or early termination, of a prisoner's a sentence (often referred to as a "Motion for Compassionate Release"). Notably, the FSA modified the statute to also allow a Motion for Compassionate Release to be filed by a defendant/inmate. *See*, FSA, PL 115-391, 132 Stat. 5195,

Title VI §603.  In pertinent part, the statute now provides that a court may modify a term of imprisonment once it has been imposed:

> . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . **extraordinary and compelling reasons** warrant such a reduction.
>                                        . . .
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. §3582(c)(1)(A)(i) (emphasis added). *See also United States v. Scparta*, 567 F.Supp.3d 416, 420-21 (S.D.N.Y. 2020).

The Sentencing Commission issued a Policy Statement for motions filed pursuant to 18 U.S.C. §3582(c)(1)(A) in U.S.S.G. §1B1.13. This section provides a court may reduce a term of imprisonment, pursuant to 18 U.S.C. §3582(c)(1)(A), after considering the factors set forth in 18 U.S.C. §3553(a), if it determines that:  (1) extraordinary and compelling reasons warrant the reduction; (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. §3142(g); and, (3) the reduction is consistent with this policy statement.  The Application Note to this section describes "Extraordinary and Compelling Reasons" as any of the following:  Medical Conditions; Age; Family Circumstances; or, Other Reasons (as determined by the BOP).  U.S.S.G. §1B1.13, Application Note 1.  However, this policy statement was issued long before enactment of the FSA.  It is now becoming settled law that §1B1.13, is outdated and does not apply to defendant initialed motions for compassionate release.

In *United States v. Brooker,* 976 F.3d 228 (2d Cir. 2020)*,* the Second Circuit stated that the U.S.S.G. §1B1.13 policy statement is "clearly outdated" following the First Step Act and that it only applies "to those motions that the BOP has made." *Id.* at 235-236. The Second Circuit concluded there is no applicable policy statement governing Compassionate Release motions brought by defendants. *Id.* at 235-237. The *Brooker* Court further held that district courts have full authority "to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *Id*. at 237. In doing so, district courts may independently decide what grounds are constitute "extraordinary and compelling" to warrant a sentence reduction.   *Id*.   ("Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline §1B1.13, limits the district court's discretion."); *see also United States v. Roney*, 833 F. App'x 850, 852 (2d Cir. 2020) (reaffirming that the "determination as to what constitutes extraordinary and compelling reasons warranting a reduction is committed to the sound discretion of the district court"); *United States v.Collado*, No. 14-cr-721 (LTS)(S  Feb. 2, 2022) (same).

Thus, we respectfully submit that, upon considering all of Mr. Gill's personal and medical circumstances, as well as the unprecedented public health crisis created by the COVID-19 pandemic, this Court should grant his motion for compassionate release.

## II.   THERE ARE EXTRAORDINARY AND COMPELLING REASONS WHICH WARRANT  THE REDUCTION OF MR. GILL'S SENTENCE TO A TERM OF TIME SERVED

*Brooker* granted reviewing courts broad discretion in deciding what constitutes an "extraordinary and compelling" reason for granting Compassionate Release. 976 F.3d at 237-38.  In indicated the reason can be a single circumstance in "isolation or combination" with other

circumstances. *Id.*  The only limitation imposed upon a court's discretion is that rehabilitation, standing alone, does not constitute an extraordinary and compelling reason. *Id.*

We contend that, along with Mr. Gill's extraordinary rehabilitation, there are multiple other factors, including but not limited to: (1) the unanticipated impact of the COVID-19 Pandemic upon Mr. Gill's confinement, (2) the continued risk of severe illness to which Mr. Gill remains exposed by virtue of both his confinement and the highly contagious and elusive Omicron subvariants now in circulation (e.g. BA.4 and BA.5); (3) Mr. Gill's hypertension and prediabetes, which each enhance his risk of severe illness if he contracts COVID-19; and (4) his lack of access to prison services, including rehabilitative courses deemed needed by the BOP, which either in isolation or in combination provide an extraordinary and compelling reason warranting granting this Motion.

A. **The Impact of the COVID-19 Pandemic on Mr. Gill's Confinement**

On March 11, 2020, the World Health Organization ("WHO") officially declared COVID-19 to be a global Pandemic.[27] The statistical data on COVID-19 is astonishing. On January 21, 2020, Washington State reported the first U.S. case of COVID-19.  Now, approximately thirty months later, as of July 28, 2022, there have been 90,936,311 reported U.S. cases and 1,025,677 reported U.S. deaths.[28] The implementation of mitigation techniques, such as social distancing; self-quarantine; stay at home orders; frequent use of sensitizer; continuous cleaning of surfaces with disinfectants; and the

---

[27]

https://www.cdc.gov/nchs/data/icd/Announcement-New-ICD-code-for-coronavirus-3-18-2020.pdf

[28]

The New York Times. "Coronavirus in the U.S.:Latest Map and Case Count".
https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?action=click&pgtype=Article&state=default&module=styln-coronavirus&variant=show&region=TOP_BANNER&context=storylines_menu
(last visited on July 29, 2022)

wearing of masks (at times, mandatory) have become omnipresent in our lives.[29]  While there was a long period of time were reports of case numbers was consistent, according to an July 28 update published in the New York Times, "roughly 130,000 new cases [are] reported each day.  This figure is certain to be an undercount, given the popularity of home tests that are not included in official data..."[30] Presently, more than half of the states are experiencing a rise in positive cases. Hospitalizations continue to increase and the number of virus deaths announced each day is higher now than it was in early July...."*Id.* These increases come as the BA.5 variant, "the most transmissible variant yet of the coronavirus is threatening a fresh wave of infections in the United States, even among those who have recovered from the virus fairly recently."[31]

During the early stages of the Pandemic, pre-*Brooker*, when presented with motions for Compassionate Release, federal district courts recognized the onset of the COVID-19 Pandemic was an extraordinary circumstance which, in conjunction with other factors, warranted granting motions for Compassionate Release pursuant to 18 U.S.C. §3582(c)(1)(A)(i). *See e.g., United States v. Hernandez*, 451 F.Supp.3d 301, 303 (S.D.N.Y. 2020) ("The COVID-19 pandemic is extraordinary and unprecedented in modern times in this nation. It presents a clear and present danger to free society for reasons that need no elaboration."); *United States v. Pena,* 459 F.Supp.3d 544, 551  (S.D.N.Y. 2020) ("As this Court has explained, the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals"); *United States v. Ozols*, No. 16-cr-692-7 (JMF),

---

[29]
https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf

[30] *See* footnote 28.

[31]*Id.*

2020 WL 2849893 at, *1 (S.D.N.Y. 2020) ("as numerous courts have concluded, the threat of COVID-19 to those in prison constitutes an extraordinary and compelling reason for compassionate release.").

When the Pandemic started, the BOP implemented so-called modified operations in response to it. The BOP heralded these modified operations as its "COVID-19 Action Plan."[32]  However, the impact of these modified operations were highly Draconian.  All visits (legal and family) were terminated.  Telephone and email contact were curtailed. All recreation, education and training programs were discontinued.  Inmates were "quarantined" (i.e., - locked up) in their cells, or dorms, for days at a time.  Inmates were served cold, or even frozen, meals. *See e.g., United States. v. Salemo*, No. 11-cr-0065-1 (JSR), 2020 WL 2521555, at *3 (S.D.N.Y. 2020) (Noting the actions taken by the BOP to mitigate the spread of COVID-19 within prisons included restrictions on visitors, restrictions on gatherings and lockdowns lasting at least two weeks).

In granting motions for Compassionate Release, in addition to recognizing the health risks posed by COVID-19, courts also "considered the extent to which onerous lockdowns and restrictions imposed by correctional facilities attempting to control the spread of the virus have made sentences harsher and more punitive than would otherwise have been the case." *United States v. Hatcher*, No. 18-cr-454-10 (KPF), 2021 WL 1535310, at *3 (S.D.N.Y. 2021) (internal quotations and citations omitted), *see also, United States v. Rodriguez*, 492 F.Supp.3d 306, 311 (S.D.N.Y, 2020)  (in which Judge Rakoff noted, "the pandemic, aside from posing a threat to [a defendant's] health, has made [a defendant's] incarceration harsher and more punitive than would otherwise have been the case. This

---

[32]

https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp

.

is because the federal prisons, as 'prime candidates' for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal."); *United States v. Reiter*, No. 87-cr-132 (VSB) 2021 WL 1424332, at *8 (S.D.N.Y, 2021) (Judge Broderick finding the harshness of a vaccinated defendant's conditions of confinement militated in favor of finding extraordinary and compelling reasons); *United States v. Mcrae*, No. 17-cr-643 (PAE), 2021 WL 142277, at *5 (S.D.N.Y. 2021) (Judge Engelmayer recognizing "a day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison."); *United States v. Collado*. No. 14-cr-731 (LTS), 2022 WL 329318, at *3 (S.D.N.Y. Feb. 2, 2022) (Judge Swain concluding, that due to Pandemic-related modifications enforced during the past two years of the defendant's incarceration, including lockdowns, lack of outdoor recreation, educational programming and inmate services, "Mr. Collado's experience in custody ... has been more difficult and punishing than the Court anticipated at the time of [his] sentencing."); *United States v. Jason Rose,* No. 03-cr-1501 (VEC), 2022 WL 19174, at *2 (S.D.N.Y. Jan. 3, 2022) (Judge Caproni noting that "'the sentence [the defendant] is now serving looks materially different from the sentence the Court envisioned."') (*quoting United States v. Garcia,* 505 F.Supp.3d 328, 332 (S.D.N.Y. 2020). This Court, itself, recently considered "imprisonment under the harsh conditions of the COVID-19 pandemic" as a relevant factor in granting a defendant compassionate release. *See United States v. Francisco-Ovalle,* No.18-cr-526 (AJN), 2022 WL 1094730, at *3 (S.D.N.Y. Apr. 12, 2022).

More than twenty-eight months after this Pandemic has began, the BOP still has not returned to "normal life." As noted above, Mr. Gill and his fellow inmates are forced to eat meals in their

rooms, or gathered on their floors, and there is little to no rehabilitative or educational programming offered.

Due to the fact that these modifications are still in place – and as the world has come to realize, COVID is far from over – there is a high likelihood that Mr. Gill will serve out the duration of his sentence under these hostile and inhumane environment .

Based upon the foregoing, we submit that the harsh conditions Mr. Gill has had to endure, and continues to endure, while in custody during the Pandemic, constitutes an extraordinary and compelling reason (either standing alone or in combination with other reasons) which warrants the granting of this Motion.

### B.    Mr. Gill's Current Confinement at USP Canaan Significantly Heightens His Risk of Contracting COVID-19

By now, it is painfully clear that the prison environment severely exacerbates the risks faced by those at liberty. As this Court, itself, has recognized numerous times, "the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals." *Pena*, 459 F.Supp.3d at 551. *See also, United States v. Williams-Bethea,* 464 F.Supp.3d 562, 568 (S.D.N.Y. 2020); *Scparta*, 567 F.Supp.3d at 425; *United States v. Stephens*, 447 F.Supp.3d 63, 65 (S.D.N.Y. 2020); *United States v. Gross*, No. 15 Cr. 769 (AJN), 2020 WL 1862251, at * 3 (S.D.N.Y. April 14, 2020). To address this "particularly grave danger," courts have acknowledged that, "[r]ealistically, the best  – perhaps the only  –  way to mitigate the damage and reduce the death toll is to decrease the jail and prison population by releasing as many people as possible." *United States v. Nkanga*, 450  F. Supp. 3d 491, 492 (S.D.N.Y. Mar. 31, 2020) *See, e.g.*, Neal Marquez, et al., COVID-19 Incidence and Mortality in Federal and State Prisons Compared with US Population, April 5, 2020 to April 3, 2021,

JAMA (October 6, 2021) (finding that, "[w]hile COVID-19 incidence and mortality rates peaked in late 2020 and early 2021 and have since declined, the cumulative toll of COVID-19 has been several times greater among prison population than the overall US population.").[33]

While initially promising, vaccines have failed to protect individuals from contracting COVID-19. Viral mutations and new subvariants, such as the BA.4 and BA.5 subvariants of Omicron, are infecting even fully vaccinated and boosted individuals, as well as those previously infected.[34] As such, as discussed below, these new variants, themselves, constitute "extraordinary and compelling reasons" to grant the requested relief.

The U.S. Food and Drugs Administration ("FDA") presently is in the process of reformulating COVID-19 booster shots to address the BA.4 and BA.5 subvariants, with expected availability to begin in the Fall of 2022.[35]  According to a June 2022 FDA press release, "it is critical that we have safe and effective vaccine boosters that can provide protection against circulating and emerging

---

[33] Available at:: https://jamanetwork.com/journals/jama/fullarticle/278944

[34]  George Citroner, Healthline, "New Sub-Variants of Omicron Detected: What to Know About BA.4 and BA.5." April 13, 2022. https://www.healthline.com/health-news/new-sub-variants-of-omicron-detected-what-to-know-about-ba-4-and-ba-5?slot_pos=article_1&utm_source=Sailthru%20Email&utm_medium=Email&utm_campaign=daily&utm_content=2022-04-13&apid=23743782&rvid=9e1f0eff07fc0bee14e2d643d3df39cf5b538b23ca74a1a62367c5765d5f4b74 (last visited July 29, 2022).

[35]Jocelyn Solis-Moreira, Health, "COVID-19 Boosters Are Being Updated to Target Omicron Subvariants–Here's Why". July 14, 2022. https://www.health.com/condition/infectious-diseases/coronavirus/updated-covid-booster-omicron?hid=8aea4e27202fe614a8ca39e7736764783d62c19d&did=808608-20220718&utm_campaign=hth-thedaily3_newsletter&utm_source=health.com&utm_medium=email&utm_content=071822&cid=808608&mid=92424855050&lctg=123192491 (last visited July 29, 2022)

variants to prevent the most severe consequences of COVID-19."[36]  The FDA has recognized that the BA.4 and BA.5 subvariants "are more resistant to antibodies from people who were triple-vaccinated with either the AstraZeneca or Pfizer-BioNTech vaccines. Both subvariants share a specific mutation in the spike protein that allows them to evade detection from different classes of antibodies." Not only are the BA.4 and BA.5 subvariants highly infectious, but they both "can infect and reinfect anyone, regardless of prior immunity. Antibodies gained after recovering from Omicron don't seem to protect against the new subvariants."[37]

Thus, and as the FDA has acknowledged, individuals can no longer rely on vaccines and boosters to protect themselves from contracting the BA.4 and BA.5 subvariants. And  given the high level of infectiousness of these subvariants among the general public, the risks to those in carceral settings like, Mr. Gill, where masks and social distancing have been thrown to the wayside, may prove life-threatening. For such reasons, courts in this district have acknowledged that "the risk of breakthrough infection is greater among incarcerated individuals than members of the general public." *United States v. Brunetti*, No. 01 Cr. 257 (JFK)*,* 2022 WL 92753, at *4 (S.D.N.Y. Jan. 10, 2022) (quoting *United States v. Johnson*, No. 98 Cr. 860 (ARR), 2021 WL 5755047, at *4 (E.D.N.Y. Dec. 3, 2021)). As Judge Keenan recognized when granting Mr. Brunetti's compassionate release motion, such breakthrough infections can lead to serious medical complications, including death for inmates with underlying medical conditions:

> While the majority of vaccinated individuals infected with the Omicron variant will only experience minor symptoms, "breakthrough" infections can still cause severe, possibly life-threatening illness in individuals who suffer from medical

---

[36]*Id.*

[37]*Id.*

conditions that render them particularly vulnerable to the virus. *See States v. Salemo*, No. 11 Cr. 65, 2021 WL 4060354, at *6 S.D.N.Y. Sept. 7, 2021 (noting vaccinated defendant with underlying medical conditions remained at high risk for "a severe case of COVID-19" if infected); *see also Johnson*, 2021 WL 5755047, at *5 (concluding vaccinated defendant "could face serious illness and even death if infected with COVID-19" due to multiple underlying medical conditions"). "For that reason, some courts have continued to find the risk of COVID-19 germane to their analysis of extraordinary and compelling circumstances, even whe[n] ... the defendant is vaccinated." *Johnson*, 2021 WL 5755047, at *5 (collecting cases).

*Id.* at *5.

Moreover, treatment options, such as the antiviral pill, Paxlovid,[38] and monoclonal antibody infusion treatments,[39] which may slow down the infection and save lives, simply are not available to incarcerated people like Mr. Gill.[40] Additionally, statistics regarding positivity rates of infection in prisons are meaningless given that the only inmates tested are those who are symptomatic.

At USP Canaan, as noted above, notwithstanding DOJ protocol for Level 2 operations, Mr. Gill remains surrounded by unmasked inmates and prison staff who do not practice social distancing. Routine testing is not being performed. Prison staff do not follow the same rules as those imposed on inmates.

_____

[38]Kyla Mandel. Time, Here's What You Need to Know About Paxlovid. May 9, 2022. https://time.com/6175031/paxlovid-covid-19-treatment/ (last visited July 29, 2022).

[39]Combat COVID. What are Monoclonal Antibodies. U.S. Department of Health and Human Services, https://combatcovid.hhs.gov/what-are-monoclonal-antibodies (last visited July 29, 2022).

[40]*See STAT,* "Prisons skimp on Covid treatments like Paxlovid, even as Biden plans to flood pharmacies with it." Nicholas Florko, March 8, 2022. https://www.statnews.com/2022/03/08/prisons-skimp-covid-treatments-paxlovid/ (last visited June 8, 2022).

In light of the foregoing, we respectfully submit that, despite receiving vaccinations and boosters, inmates in federal prisons, like Mr. Gill, remain at a heightened risk of contracting COVID-19. Moreover, a facility's low number of reported infections (USP Canaan reports no cases of inmate infection and two cases of staff infection) does not support concluding that the infection rate at that facility is low.[41] The CDC has estimated that at least 30% of the population (if not more) are asymptomatic and that 50% of new cases result from transmission of the disease by individuals who are presymptomatic (infected individuals who have not yet exhibited symptoms).

According to the BOP, USP Canaan houses a total of 1261 inmates and 214 staff.[42]  For the more than two years the pandemic has been raging, BOP reports it has completed COVID testing on 1157 inmates at Canaan (thus, not everyone), of which 434 inmates tested positive (approximately 38% of the facility's inmate population).  Notably, despite the past positivity rates, and the highly contagious nature of the present Omicron sub-variants, BOP presently reports **no** pending tests on any the facility's inmate population.[43]  Therefore, BOP's report that not even one inmate at Canaan has presently tested positive  recovered with COVID should not be interpreted to mean that inmates at Canaan, like Mr. Gill, are not subject to a heightened risk of infection by their continued

---

[41]Federal Bureau of Prisons. COVID-19 Coronavirus. COVID-19 Cases. https://www.bop.gov/coronavirus/ (last visited July 29, 2022).

[42]*See* https://www.bop.gov/locations/institutions/caa/ (last visited July 29, 2022).

[43] *See* FEDERAL BUREAU OF PRISONS, COVID-19 Cases. COVID-19 Inmate Test Information.  https://www.bop.gov/coronavirus/   (last visited July 29, 2022).

incarceration. Rather, BOP's statistics are entirely meaningless as, from their own published data, it appears no inmates have pending tests.[44]

This Court has previously found that even where a facility has not yet reported any confirmed COVID-19 cases, carceral conditions pose unique risks to vulnerable inmates because of the potential for the rapid introduction and spread of the disease. *See Williams-Bethea*, 464 F.Supp.3d at 569, *United States v. Camper,* No. 13-cr-378 (AJN), 2020 WL 7647457, at *3 (S.D.N.Y. 2020). *United States v. Fernandez*, No. 12-cr-844-9 (AJN), 2020 WL 7647459, at *3 (S.D.N.Y. Oct. 14, 2020). Moreover, this Court has further recognized that once a virus enters a correctional facility, "community spread [is] all but unavoidable." *Id.* And that– as Mr. Gill has confirmed – guards and staff, moving freely between units, also may introduce and spread the virus. *Id.*, *see also Scparta*, 567 F.Supp.3d at 425.

Accordingly, this Court should conclude that these new Omicron variants, themselves, constitute "an extraordinary and compelling" reasons for granting Mr. Gill's motion. *See Rose,* 2022 WL 19174, at *1 (in which Judge Caproni recently found that "the  COVID-19 pandemic, including the wildly contagious Omicron variant,  constitutes an extraordinary and compelling reason to grant [the defendant's motion for compassionate release]."); *see also, United States v. Valencia-Lopez,* No. 05-cr-841 (NGG), 2022 WL 198604, at *3. (E.D.N.Y. Jan. 21, 2022) ("As a threshold matter, the COVID-19 landscape has changed dramatically within the past month alone as the current surge, driven by the Omicron and Delta VOCs. The rapid spread of these highly transmissible VOCs has

---

[44] Centers for Disease Control and Prevention. COVID-19 Pandemic Planning Scenarios, Updated March 19, 2021.
https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html (last visited July 29, 2022).

resulted in higher rates of breakthrough infections generally, with prison and immunocompromised populations increasingly susceptible to those breakthrough cases"), *citing United States v. Brunetti,* No. 01-cr-257 (JFK), 2022 WL 92753, at *4 (S.D.N.Y. Jan. 10, 2022) ("In light of the rapid spread of the Omicron variant and its partial resistance to the COVID-19 vaccines, the Court ... concludes that [movant] has established that extraordinary and compelling circumstances' support his release."); *United States v. Johnson,* No. 98-cr-860-7 (ARR), 2021 WL 5755047, at *4 (E.D.N.Y. Dec. 3, 2021) ("The risk of breakthrough infection is greater among incarcerated individuals than members of the general public."); Ctrs. for Disease Ctrl. and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/stay-up-to-date.html (last visited Jan. 18, 2022) ("Individuals who are moderately or severely immunocompromised should get an additional primary shot and a booster shot."); *United States v. Reyes,* No. 11-cr-1, 2021 U.S. Dist. LEXIS 99864, at *6, 2021 WL 2154714 (D. Conn. May 26, 2021) (granting compassionate release for fully vaccinated movant where "newly available data describe 'breakthrough infections' caused by COVID variants in vaccinated populations"). Thus, as a matter of science, the available evidence, and common sense, it is abundantly clear Mr. Gill would be significantly safer from the virus outside of the prison setting where he could practice social distancing and other basic health and safety measures.

C.    **Mr. Gills's  Hypertension and Prediabetes, Coupled with His Family History of These Diseases, Places Him at Serious Risk from COVID-19 if he remains incarcerated**.

As a further reason to find that extraordinary circumstances exist, we remind the Court of the serious risk Mr. Gill faces from COVID-19 if he remains incarcerated due to his hypertension and prediabetes. "Since the onset of the COVID-19 pandemic, numerous courts have held that the presence of **preexisting [medical] conditions** that increase the risks associated with the virus, **in**

**combination with the conditions of confinement**, constitute extraordinary and compelling reasons

for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)." *United States v. Serrano*, No. 13 Cr.

58, 2020 WL 5259571, at *3 (S.D.N.Y. Sept. 3, 2020) (collecting cases) (emphasis supplied); *see also*

*United States v. Bush*, No. 17 Cr. 611-4, 2021 WL 3097417, at *2 (S.D.N.Y. July 21, 2021) (noting

"[c]ourts have granted modified sentences in light of COVID-19 for inmates with illnesses or injuries

that make them particularly vulnerable to COVID-19").

      The CDC has identified both of the medical conditions from which Mr. Gill suffers as factors

that place individuals at a "higher risk for severe illness from COVID-19."[45]   Indeed, "[t]he more

underlying medical conditions someone has, the greater their risk is for severe illness from

COVID-19." *Id.*[46]   Moreover, a meta-analysis of several science databases suggested that

"hypertension was independently associated with a significantly increased risk of critical COVID-19

and in-hospital mortality of COVID-19."[47]   For those who are at a high risk of severe illness, like Mr.

---

[45] Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions, CENTERS FOR DISEASE CONTROL AND PREVENTION, Updated May 2, 2022. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#chronic-kidney-disease (last visited July 29, 2022).

[46] *See also* Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19) at 12, WORLD HEALTH ORGANIZATION (Feb. 16-24, 2020), https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf (finding that patients with certain pre-existing medical conditions faced a higher probability of death upon contracting COVID-19: the mortality rate for those with cardiovascular disease was 13.2%, diabetes was 9.2% , hypertension was 8.4% , chronic respiratory disease was 8.0% , and cancer 7.6%  -- compared to a rate of 1.4% for those who were otherwise healthy).

[47] Du Y, Zhou N, Zha W, Lv Y. "Hypertension is a clinically important risk factor for critical illness and mortality in COVID-19: A meta-analysis". Nutr Metab Cardiovasc Dis. 2021 Mar 10;31(3):745-755. https://pubmed.ncbi.nlm.nih.gov/33549450/ (last visited July 29, 2022).

Gill, the CDC recommends "wear[ing] a mask or respirator with greater protection in public indoor spaces if you are in an area with a high COVID-19 Community Level."[48] As noted, this simply is not possible for Mr. Gill

Based on the CDC's information, this Court has stated, repeatedly, that "COVID-19 presents a heightened risk for individuals with hypertension, like the Defendant." *Williams-Bethea,* 464 S.Supp.3d 567; *Scparta*, 567 F.Supp.3d at 427; *Pena*, 459 F.Supp.3d at 550. *See also, United States v. Sawicz*, 453 F.Supp.3d 601, 605 (E.D.N.Y. 2020); *United States v. Zukerman*, 451 F.Supp.3d 329, 335 (S.D.N.Y. 2020); *United States v. Rodriguez*, 451 F.Supp.3d 392, 401 (E.D. Pa. 2020).

Likewise, Mr. Gill's prediabetes, a precursor to type 2 diabetes, represents a second underlying medical problem which this Court has recognized leads to "heightened risk for severe illness from COVID-19."*Fernandez,* 2020 WL 7647459, at *3. *See also Zukerman*, 451 F.Supp.3d at 329. ("The CDC similarly has explained that individuals over the age of 65 and **people of any age who have serious underlying medical conditions**, **including** heart conditions, **diabetes**, and obesity, **are at higher risk for severe illness from COVID-19**." (emphasis added). *See also United States v. Colvin*, 451 F.Supp.3d 237, 241 (D. Conn. 2020) (finding "extraordinary and compelling reasons justifying ... immediate release under Section 3582(c)(1)(A) and U.S.S.G. § 1B1.13" where defendant has "diabetes, a serious medical condition which substantially increases her risk of severe illness if she contracts COVID-19" and high blood pressure.); *Rodriguez,* 451 F.Supp.3d at 402 ("An early World Health Organization report on COVID-19 found that '[i]ndividuals at highest risk for severe disease and death include people ... with underlying conditions such as hypertension [and] diabetes.' While

---

[48]*See* n.45.

the preliminary overall fatality rate in the report was 3.8%, the fatality rate for people with diabetes was 9.2%. The fatality rate for people with hypertension was 8.4%.").[49]

Additionally, as this Court previously has acknowledged, the treatment of Mr. Gill's hypertension with medications, in particular, Losartan, arguably further elevates his risk of severe illness if he contracts COVID-19. *Gross,* 452 F.Supp.3d at 27 (citing, Lei Fang *et al.*, *Are Patients with Hypertension and Diabetes Mellitus at Increased Risk for COVID-19 Infection?*, The Lancet (Mar. 11, 2020), at 1, https://doi.org/10.1016/S2213-2600(20) 30116-8 (hypothesizing that hypertension treatment with angiotensin II receptor blockers, such as Losartan, "increases the risk of developing severe and fatal COVID-19")).

Finally, as detailed above, several of Mr. Gill's close family members (his mother, maternal grandmother, and paternal aunt) suffer from these same conditions. As the Centers for Disease Control and Prevention ("CDC") have recognized, a  family history of heart disease and/or diabetes dramatically increases an individual's risk for developing a similar, and potentially fatal, condition.[50] Aside from genetics, race and ethnicity play a recognized role in increasing risk for heart disease.

---

[49] quoting, Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 24, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.

[50] *See Family Health History and Chronic Disease*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/genomics/famhistory/famhist_chronic_disease.htm (last visited July 29, 2022) ("If you have a family health history of a chronic disease like cancer, heart disease, [or] diabetes . . . you are more likely to get that disease yourself").

African Americans, among others, are at a higher risk of being diagnosed with diabetes and prediabetes.[51]

We respectfully submit that Mr. Gill's hypertension and prediabetes, and his family medical history, place him at a higher risk of severe illness from COVID-19, particularly the more contagious and prominent BA.4 and BA.5 subvariants in circulation. Notwithstanding the CDC's guidance, in the carceral setting of USP Canaan, Mr. Gill cannot adequately protect himself,  particularly as those around him fail to do so. And absent meaningful testing, there is no way to gauge the COVID-19 Community level in USP Canaan at any given point. Accordingly, Mr. Gill's underlying medical conditions, considered together with the other factors set forth herein, weigh in favor of his compassionate release.

### III.    MR. GILL'S COMPASSIONATE RELEASE IS SUPPORTED BY 3553(a) FACTORS

#### A.    <u>Mr. Gill's Rehabilitation Has Been Extraordinary</u>.

By our calculations, and as noted above, Mr. Gill has served approximately 55% of his sentence.  During this time, and despite his lack of access to formal educational courses and other prisoner services for much of the past 28 months due to Pandemic, Mr. Gill's record demonstrates his extraordinary rehabilitation. "While '[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason,' 28 U.S.C. § 944(t), it is clear that 'rehabilitation is <u>relevant</u> to the question of whether a sentence should be reduced.'" *United States v. Piggott,* No. 94-cr-417

---

[51] *See Diabetes Risk Factors,* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/diabetes/basics/risk-factors.html (last visited July 29, 2022)

(SHS), 2022 WL 118632, at *2  (S.D.N.Y. Jan. 11, 2022), quoting, *United States v. Millan,* No.
91-CR-685 (LAP), 2020 WL 1674058, at *7 (S.D.N.Y. Apr. 6, 2020) (emphasis in original).

As detailed in the Relevant Background section above, and corroborated by Exhibits B-E, Mr.
Gill has used his time productively by seeking educational and vocational opportunities that will
allow him to make positive contributions to society upon his release.  Not only has Mr. Gill obtained
his GED while incarcerated on this case, and availed himself of completing educational course work
in a wide array of subjects (Exhibits B and C), but he also has further refined his preexisting culinary
skills by working as a chef in prison kitchens, including for the staff.  In doing so, his supervisors
have noted myriad times, in Mr. Gill's Work Performance ratings, his excellent work ethic as well
as his talent for preparing many a delicious meal (Exhibits D).  His sample menus (Exhibit E),
offering a variety of dishes and cuisines, are a further testament to his creativity and the high quality
of his job performance. The fact that he was tasked to cook for the prison staff, with little to no
supervision required, speaks volumes of Mr. Gill's professionalism, trustworthiness and assumption
of  responsibility.

Notwithstanding his love of cooking, and his talent for doing so, as previously noted, when
requested to, Mr. Gill transferred from the kitchen and is working for the past four months, since
March 22, 2022, as a plumber. (*See* Exhibit B at 2).  In doing so, Mr. Gill has welcomed the chance
to learn, on the job, another meaningful profession that will further enhance his value in the work
force, and offer him meaningful employment opportunities, upon his release. Notably, the Progress
Report states that: "Inmate is currently assigned to the following work detail: USP PLUMBING ALL
DAY. He has gained employable work skills through his employment in Federal Prison." *Id.*  Thus,
the BOP, itself, recognizes that Mr. Gill presently has the capacity to find work upon his release.

38

Moreover, while the Reentry Plan lists seven disciplinary reports between May of 2014 and October of 2020 (an approximate six-year period), we respectfully submit that these constitute minor infractions, none of which involve violence. (Exhibit B at 2). The Reentry Plan lists three incidents involving the alleged possession or use of drugs/alcohol, three incidents involving the alleged possession of an "unauthorized item," and one incident involving the alleged possession of a "non-hazardous tool." *Id.* Upon information and belief, in the first year of his incarceration in 2014, marijuana was found in Mr. Gill's urine. In 2016, half of a marijuana cigarette was recovered from under a toilet in his cell. In 2020, drugs were found in Mr. Gill's cell which he asserts were not his, but rather that he was framed. His appeal of that charge remains pending. With respect to the "unauthorized item" charges, upon information and belief, Mr. Gill was written up twice for tobacco and once for body lotion. The non-hazardous tool charge also related to tobacco. Based on the foregoing, we respectfully submit that, in light of Mr. Gill's extraordinary rehabilitation, if granted compassionate release, he is ready to assume the role of a productive citizen, who can contribute to society in a variety of ways, including as a chef or a plumber.

Moreover, while the BOP has recommended that Mr. Gill complete classes in Parenting, CDL, OSHA and VT Culinary Arts, as well as "six core topics in the Release Preparation Program" (Exhibit B at 2, 3), these classes have been unavailable at USP Canaan and, it is anyone's guess as to when, if ever, they will be offered again. In any event, given Mr. Gill's acknowledged skills in both plumbing and cooking, the BOP's opinion that these unavailable courses are somehow needed in order for Mr. Gill to "secure employment upon release" should be rejected by this Court as unfounded and inconsistent with its own prior observations.

In *United States v. Camper,* No. 13-cr-378 (AJN), 2020 WL 7647457 (S.D.N.Y. Sept. 2, 2020), this Court granted Mr. Camper's compassionate release motion under circumstances similar to those in Mr. Gill's case.  Like Mr. Gill, Mr. Camper was charged with conspiracy to commit Hobbs Act robbery, conspiracy to distribute narcotics and use of a firearm during and in relation to a crime a violence.  After pleading guilty to conspiracy to commit Hobbs Act robbery and conspiracy to distribute narcotics, this Court sentenced Mr. Camper to 188 months' imprisonment. *Id.* at *1.  In later granting Mr. Camper compassionate release, after noting that "Mr. Camper's crimes were serious," this Court also noted that, while Mr. Camper had a number of prior drug offense convictions, he had only one prior conviction for a violent crime, over thirty years ago, when he was just twenty-one years old. *Id.* at *2. This Court also "credited" Mr. Camper's "statement of contrition" at his sentencing, in which he "expressed a genuine desire to change his life." *Id.*

Additionally, the Court pointed to Mr. Camper's "remarkable record in prison" and his clean disciplinary record. *Id.*  This Court cited to Mr. Camper's educational accomplishments, and his work in the Food Service Department and educational Culinary Program at FCI Schuylkill, along with memoranda submitted by his supervisors "praising his abilities, work ethic and attitude."  *Id.*

While concluding that, at the time, Mr. Camper's 188 month original sentence reflected the seriousness of his offense, this Court found that "the Court's analysis is different under the current circumstances." *Id.* These "current" circumstances included the fact that Mr. Camper had "already served over half of his effective sentence," and the "health risk that continued incarceration poses to him" due to his medical conditions and the COVID-19 pandemic. *Id.*

This Court determined there were "extraordinary and compelling reasons" to warrant a reduction in Mr. Camper's sentence. *Id.* at *3.  While there were no reports of COVID-19 by the BOP

at FCI Fort Dix (at that time), where Mr. Camper was housed, this Court noted that, regardless, "carceral conditions pose unique risks to vulnerable inmates because of the potential for rapid introduction and spread of the disease." *Id.* (internal citations omitted). Pointing to Mr. Camper's obesity and moderate chronic sleep apnea, along with his age (54 years old), this Court found that "the COVID-19 pandemic amounts to an extraordinary and compelling circumstance in his case." *Id.*

The Court also found that Mr. Camper did not "pose a danger to the safety of any other person or the community" notwithstanding his conviction of "conspiring to rob drug dealers." *Id.* In support of this finding, this Court noted that Mr. Campers's "spotless disciplinary record and significant educational achievements while incarcerated reflect rehabilitation consistent with the sincere remorse he expressed at sentencing." *Id.* Also, his only prior conviction for a violent crime had occurred thirty years earlier. *Id.*

Given the meaningful similarities between Mr. Gill and Mr. Camper's cases, we respectfully submit that this Court should also reduce Mr. Gill's sentence.

Like Mr. Camper, Mr. Gill has served over 50% of his sentence and has demonstrated "extraordinary and compelling" circumstances that warrant granting his motion. Though Mr. Gill is approximately 13 years younger than Mr. Camper, he is still a middle-aged man with two underlying health conditions – hypertension and prediabetes. Both of these conditions place him at higher risk of serious complications should he contract an Omicron subvariant, regardless of his being vaccinated and boosted, as does the fact he resides in a carceral setting. *See Brunetti*, 2022 WL 92753, at * 4-5. Mr. Gill's educational accomplishments over the past eight years, and his outstanding record of job performance further demonstrate "extraordinary and compelling" reasons for his compassionate release (Exhibits C and D). Like Mr. Camper, Mr. Gill has provided myriad reviews from prison staff

attesting to his superior abilities, work ethic and positive attitude (Exhibit D). While his disciplinary record is not spotless, as explained above, it is the product of minor infractions over the course of six years, more than half involving possession of tobacco and lotion, neither considered contraband outside of the prison environment. Moreover, none of these charges involved violence of any degree.

Section 3553(a) factors also support granting Mr. Gill's motion for reasons similar to Mr. Camper's. Mr. Gill is not a danger to the community.  Prior to his conviction in this case in 2014, his only prior conviction for a violent offense was in June of 2004, over eighteen years ago, when he was just twenty-three years old. PSR at ¶ 56. Moreover, like Mr. Camper, Mr. Gill's genuine expression of remorse at sentencing has been corroborated by his substantial rehabilitative efforts. Furthermore, as discussed below, Mr. Gill has a proposed release plan that will provide him with a home, a job and the support of family, in a secure environment, far from the neighborhood he lived in at the time he committed the instant offense.

Thus, we respectfully submit that, Mr. Gill, for reasons similar to Mr. Camper, has demonstrated his entitlement to compassionate release. *Camper*, 2020 WL 7647457, at *4. *See also United States v. Fernandez,* No. 12-cr-844-9 (AJN), 2020 WL 7647459 (S.D.N.Y. Oct. 14, 2020)(51-year-old defendant, who suffers from hypertension and diabetes, with no prior record, whose offense conduct did not involve violence and who maintained a good record in prison, had a single disciplinary infraction for unauthorized use of cell phone, and had competed numerous educational courses, granted compassionate release); *United States v. Bolanos,* No. 17-cr-339(AJN), 2020 WL 7647458, at *2-4 (S.D.N.Y. Sept. 17, 2020) (50-year-old defendant, with a significant prior non-violent criminal history, who served about half of his effective sentence, suffering from obesity and hypertension, convicted of distributing 300 grams of crack, who accepted responsibility for his

conduct, obtained employment in food services during his incarceration, demonstrated commitment to addressing his underlying substance abuse problem, had a clean disciplinary record, "suggesting that he is indeed on a path to rehabilitation" found to have established "extraordinary and compelling" reasons warranting compassionate release." *Williams-Bethea*, 464 F.Supp.3d at 562 (50-year-old defendant, who embezzled over 2 million dollars, accepted responsibility for her conduct, expressed genuine remorse, and suffers from hypertension and obesity, found entitled to compassionate release, notwithstanding zero cases of COVID at FCI Danbury).

**B.**    **Mr. Gill Has a Release Plan That Ensures Both His Safety and the  Community's, and Will Allow Him to Successfully Reintegrate into Society**.

If the Court grants this application, Mr. Gill will reside in the home of his 59-year-old uncle, Luther Gill, who is a disabled veteran employed by the VA hospital. Luther Gill lives in a four bedroom, single-family home with his wife and granddaughter in Orlando, Florida, which he owns. Luther's  home is located in a quiet neighborhood and has two bathrooms and two extra bedrooms, one of which would be Mr. Gill's. Luther can support Mr. Gill financially and would be able to find him a job.  He regularly attends church and is often visited by Mr. Gill's mother. There also is other family in the area. As such, Mr. Gill would have a safe and secure home, surrounded by loved ones and opportunities for employment.

Additionally, following his release, Mr. Gill will have the support and assistance of several other family members and friends, each of whom has provided a letter describing Mr. Gill's personal background and, a few of whom have promised him employment. Copies of these letters are attached hereto as Exhibit J.

43

|  | Relationship to Mr. Gill |
|---|---|
| Rashenda Gill | Sister |
| NyJerria Mcclam | Daughter |
| Tonya Gill | Mother |
| Jacquita Alexander | Cousin |
| Dayana Cafa | Long-time friend |

Collectively, these letters paint the picture of a man who is kind, caring and remorseful. From behind bars, he has served as a role model to others, hoping to help them avoid the mistakes he has made. Excerpts from these letters are as follows:

His sister, Rashenda Gill, speaks of the emotional support Mr. Gill has shown to his children, through phone calls, during his incarceration. She also writes of Mr. Gill's remorse, rehabilitation and the "supportive family and stable environment" waiting for him when he returns home, including her own plan to assist her brother to find a job:

> ... I've spent a lot of time on the phone with Tariq, and he's well aware of his past mistakes and the harm he's done. He is now a very different person than he was when he was convicted in his early 30s. I've seen thoughtfulness, generosity in sharing his teachings and insights, passion for life, a sense of humor, and deep love for his family just to name a few qualities I've noticed over the past couple of years. I've asked him some tough questions about his life and the lives he affects over the months, and what I've gathered is that he is not afraid of the truth, and **understands his story to be a testimony to help others make different decisions in their lives**. Tariq should be considered for release, in my opinion. I am certain that he is not a threat to society, but rather a benefit to his family. When he returns to society, he will be in good company with his supportive family, who will be there to assist him in starting a new life. I can honestly state that **he has worked hard at his own rehabilitation and that he has a family and a network of support** that will help him succeed when he returns to us.

(emphasis supplied).

44

NyJerria Mcclam, Mr. Gill's adult daughter, writes on behalf of herself and her younger

siblings. Speaking of the time she already has missed spending with her father, Ms. Mcclam writes:

> ... I can't get the time back that I missed out of but what I can do is ask you to give
> that time to my siblings so that they will not miss out ... The years I felt I needed him
> the most, he wasn't there and all I can ask is for you to give us that time now.  My
> siblings and I miss him more than I can explain and I just wish you can give us this
> time.

Tonya Gill, Mr. Gill's mother, a former addict, who admits to failing to guide her son when

he was growing up, asks the Court to please give Mr. Gill "a **s**econd chance at life and to be a father

and a son. Mrs. Gill writes:

> ... your honor I'm not trying to condone what my son has done what I'm trying to do
> is to give you some reasons why his life may have turned out the way it did first of all
> **when my son was growing up me and his father were on drugs we were not there
> to give him the guidance he need to be a better person he grew up in the projects
> where the streets was his parents and that's something I have to live with for the
> rest of my life** since then I have got myself together I have been drug free for 12 years
> now my son has three children who Miss indeed him in their lives so hopefully they
> won't make the same decisions in their lives I can say one thing that all that I want
> through has taught me how to be a better man ...

(emphasis supplied).

Mr. Gill's cousin, Jacquita Alexander, also writes to ask your Honor to reduce his sentence,

and to give Mr. Gill "another chance to prove he has the ability to conform to society and become a

productive citizen." She describes many of Mr. Gill's "positivity abilities" and of the support that she,

and the rest of his family, can now offer to him when he is released. Ms. Alexander writes:

> ... Although none of us are rich, we all have the economic means and education to
> support Tariq until he is able to re-enroll in school, find a job, or start a cooking
> business. Unfortunately, the opportunities that we currently possess were not present
> during his incarceration. Both of his sisters have small businesses that can enable him
> with rapid employment opportunities. I have a host of degrees including (Liberal Arts,
> Criminal Justice, Psychology and Nursing) and I am also in the process of becoming

*a small business owner. Therefore, this will prevent Tariq from participating in illegal activity to provide for hisself or family.*

Dayana Cafa, Mr. Gill's close friend for more than 10 years, writes of his kindness, generosity and support, and of the employment she can offer him at Lowe's Home Improvement – where she works in HR – when he is released. Ms. Cafa states, *"Tariq will strive to make amends, and I am sure we will get to see his good works bringing fruitful results to our society again."* She writes:

> *... I have always found him to be extremely kind, dependable and well regarded among his peers. He has helped me getting through some of the roughest moments in my life, despite being in a not-so-good situation himself. He is a great person and an excellent friend. He has always shown to have a generous, kind and devoted character toward others.*
>
> *As per myself, I am a law-abiding citizen and HR at Lowe's Home Improvement. **I can guarantee you that as soon as Mr. Gill is released, he will be offered employment here at Lowe's with relocation possibility in any USA state. I am sure he learned from this experience and will not think of repeating it.***

(emphasis supplied).

In a letter written by Mr. Gill, himself, dated November 11, 2020 (attached as Exhibit K), Mr. Gill writes to give "my version of the happening of my life. ... Times in which I've been making progress on a small scale in some areas and larger in others. But progress nonetheless." Mr. Gill continues:

> *. . . I feel its necessary that "I" speak on my behalf than leaving you with the option of having other peoples reports detailing their perception of me when in fact I'm quite able to do so, not to mention, proud of my accomplishments of the past 7 years. Nor am I ashamed of the setbacks I've encountered because I now know that recovery is a process. An during this process I'm combating problems for which I misplaced as being a part of life for so long... Specifically involving the use of tobacco and drugs. Fact is, I'm no stranger to being labeled (self) an addict and my history reflects that. ... Yet I'm no longer content with those practices and I'm no longer satisfied with being an addict. I can accept being an recovering addict which I strive to be just as I'm working at bettering myself. I've held down the same job for over 5 years, As I've been useful at helping other incarcerated brothers find pleasure in the culinary field.*

46

*I'm in tune with spirituality, I've been applying time and energy into mental health and wellness by requesting and completing self help pamphlets regarding anger and the misplacement of it amongst other things because deep down I know the correlation my anger issues instigate my propensity to substance abuse, And how. It is to not just attend the problems but to simultaneously work at the subcomponents as well. So yes Your Honor I've been very busy in here, taking life as serious as I wish I did years ago. Digging into any crack and crevice that may hide a negative reservation or contain a positive idea. Building relations with family members and garnering a support system with people who not only have resources but also time that's necessary with puttin gmy first foot forward when I do reclaim my freedom. I'm leaving no stone unturned and this concludes why I'm writing to you. Because the fine details that "I" mentioned will not be found in the generic reports...."*

Accordingly, as demonstrated above, the 3553 factors do not foreclose Mr. Gill from Compassionate Release. *See Camper*, 2020 WL 7647457, at *4; *Fernandez,* 2020 WL 7647459, at *4;  *Bolanos,* 2020 WL 7647458, at *2-4 *Williams-Bethea*, 464 F.Supp.3d at 562; *Pena,* 459 F.Supp.3d at 547; *Rose,* 2022 WL 19174, at *1*; Collado,* 2022 WL 329318, at *1, 4. Mr. Gill has served approximately 55% of his sentence, during which time he has shown himself to be well on the road to rehabilitation. He has taken numerous educational courses and held prison jobs, including as a chef and plumber. He has excelled in his work and demonstrates a strong work ethic. The skills he has acquired make him marketable in more than one professional field and should guarantee his employment when released. Though his offense was serious, he has fully accepted responsibility for his actions from the beginning by pleading guilty. And at sentencing, he expressed his remorse and a genuine desire to improve himself.  His Reentry Plan, Educational Certificates, and Reviews from staff(Exhibits B-D), show that he has made good on his promises. His continued incarceration not only exposes him to great health risks, but it also prevents him from further educating himself due to the lack of prison services and academic classes.  His prior criminal history is a reflection of his prior addition to drugs, an addiction that no longer has a hold on him.

When released, he will live in a safe and secure environment, with his uncle and family, who will support him financially and emotionally.  From there, Mr. Gill will be assisted  by his uncle, his sister, Rashenda, his cousin, Jacqui, and his friend, Ms. Cafa, in finding work. He is no longer a danger to the community, has received and served serious punishment for his crime. Having learned his lesson the hard way, he now seeks to rejoin his family and has the tools he needs to become a productive member of society.

**C.**      **Under current law, Mr. Gill no longer qualifies as a Career Offender such that the sentence enhancement he received is not necessary to reflect the seriousness of the offense or promote respect for the law**.

Although the PSR classified Mr. Gill as a career offender, and this Court sentenced him as such, based on current case law, Mr. Gill does not have at least two prior felony convictions of either a crime of violence or a controlled substance offense.  Therefore, if sentenced today, he would no longer be a career offender. As the Supreme Court recently found in *Concepcion v. United States*, the First Step Act allows district courts to consider intervening changes of law or fact in exercising their discretion to reduce a sentence. 142 S.Ct. 2389, 2396 (2022).  In *Concepcion*, the Court held that in Section 404 motions under the First Step Act for retroactive application of the Fair Sentencing Act (the reduction in crack cocaine penalties), the sentencing court may consider ameliorative changes in the law since the original sentencing – even though the ameliorative changes themselves were not made retroactive. *Id.* at 2404. As Judge Sotomayor acknowledged, "There is a longstanding tradition in American law, dating back to the dawn of the Republic, that a judge at sentencing considers the whole person before him or her "as an individual." *Koon v. United States,* 518 U. S. 81, 113 (1996)." *Id.* at 2395.

"From the beginning of the Republic, federal judges were entrusted with wide sentencing discretion." K. Stith & J. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts 9* (1998) (Stith & Cabranes). Federal courts historically have exercised this broad discretion to consider all relevant information at an initial sentencing hearing, consistent with their responsibility to sentence the whole person before them. <u>That discretion also carries forward to later proceedings that may modify an original sentence</u>. Such discretion is bounded only when Congress or the Constitution expressly limits the type of information a district court may consider in modifying a sentence.

*Id.* at 2398. (emphasis supplied). As discussed below, Mr. Gill's prior N.J. narcotics convictions are not valid predicates for finding him a Career Offender because, as recognized by recent changes in the law, New Jersey's definition of a narcotic drug substance sweeps more broadly than the definition contained in the federal Controlled Substances Act ("CSA"). Accordingly, this Court should consider this ameliorative change of law in deciding Mr. Gill's instant motion to reduce his sentence. *Id. See also, Brunetti*, 2022 WL 92753, at *5 ("In considering the § 3553(a) factors in this case, the Court is particularly mindful of the disparity between Brunetti's mandatory life sentence and the sentence a similarly situated defendant would receive today based on recent changes in the law."); *see also United States v. Parke*, No. 08-cr-24-BU (BMM), 2021 WL 4485332, at *2 (D.MT, Sept. 30, 2021) (In granting compassionate release, court considered Parke's marijuana conviction would not have qualified him as a career offender if sentenced today because Montana state law is broader than its federal counterpart as it fails to exclude hemp from its definition of a controlled substance).

The Second Circuit already has determined that because New York's definition of "narcotic drug" is broader than that in the CSA, the state statute is not a categorical match to its federal counterpart. *See United States v. Townsend*, 897 F.3d 66 (2d Cir. 2018) (N.Y. Penal Law §220.31). This is because  N.Y. Penal Law § 220.00(7)defines "narcotic drug" as "any controlled substance listed in schedule I(b), I(c), II(b), or II(c) other than methadone." And N.Y. Pub. Health L. § 3306

Schedule II(b), does not exclude either naloxegol or naldemedine. In contrast, the federal schedule explicitly excluded naloxegol in 2015 and naldemedine in 2017.[52] Compare 21 C.F.R. § 1308.12(b)(1) with N.Y. Pub. Health L. § 3306(II)(b)(1). New York's Schedule II(b)(4) also criminalizes all cocaine isomers, whereas the federal schedule controls only "optical and geometric isomers." 21 C.F.R. § 1300.01. Compare 21 C.F.R. §1308.12(b)(4) with N.Y. Pub. Health L. § 3306(II)(b)(4). In conducting this analysis, the Second Circuit has defined "controlled substance" to take on the definition of the term as used under federal law, referring to substances listed on the federal drug schedules. *Townsend*, 897 F.3d at 70-71.

While the Third Circuit has not expressly addressed the question of whether the term "controlled substance" takes on the federal definition, district courts within the Third Circuit, including in New Jersey, have concluded it does. *See United States v. Lewis*, No. 20-583 (FLW), 2021 WL 3508810 (D.N.J. Aug. 10, 2021), appeal pending, No. 21-2621 (3d Cir.); *United States v. Scott*, No. 18-cr-547 (MAS), 2021 WL 6805795 (D.N.J. Dec. 6, 2021). In *Lewis*, using the categorical approach, Chief Judge Wolfson found the defendant's prior marijuana conviction was not a valid predicate offense under U.S.S.G. § 2K2.1(a)(4)(A) because New Jersey's definition of marijuana was broader than the federal definition under section 802(16)(A) of the CSA., "because, at the time of Defendant's conviction, the New Jersey definition of marijuana did not exclude hemp." 2021 WL 3508810, at *10. *See also United States v. Miller*, 480 F.Supp.3d 614, 621 (M.D.Pa. 2020) (holding term "controlled substance" in the career offender guideline "must refer[] exclusively to those drugs listed under federal law—that is, the federal Controlled Substances Act (CSA) and therefore,

---

[52] https://www.deadiversion.usdoj.gov/fed_regs/rules/2015/fr0123_3.htm#:~:text=811(c)%2C%20including%20cons ideration,schedule%20II%20of%20the%20CSA and https://www.deadiversion.usdoj.gov/fed_regs/rules/2017/fr0929.htm

defendant's conviction for possession with intent to deliver marijuana statute did not qualify as a "controlled substance offense" under Section 4B1.2(b) because at the time of the defendant's prior conviction, Pennsylvania defined marijuana to include hemp, whereas the federal definition of marijuana explicitly excluded hemp); *United States v. Jamison*, 502 F.Supp.3d 923 (M.D.Pa 2020)(holding that a prior conviction for possession with intent to distribute marijuana did not qualify as a prior controlled substance offense, because the state statute was broader than its federal counterpart).

In *Scott*, the defendant had a prior New Jersey conviction for intent to distribute crack cocaine, in violation of N.J. Stat. Ann. § 2C:35-5, which prohibits manufacturing, distributing or dispensing, or possessing with intent to distribute less than one-half ounce of several controlled substances, including crack cocaine. *See* N.J. Stat. Ann. § 2C:35-5(b)(1), (3).  Applying the modified categorical approach and the CSA's definition of "controlled substances," Judge Shipp concluded that New Jersey's intent-to-distribute offense was not a valid predicate "controlled substance offense" for applying a base-level sentencing enhancement under  U.S.S.G. §2K2.1(a)(2). Comparing the Guidelines with the New Jersey statute under which the defendant was convicted, the Court found that the federal regulations exclude from the definition of "controlled substances" certain cocaine derivatives, including Ioflupane:

> "[d]ecocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine" and "[123 I]Ioflupane." 21 C.F.R. § 1308.12(b)(4) (2021); see also Schedules of Controlled Substances: Removal of [123 I]Ioflupane From Schedule II of the Controlled Substances Act, 80 Fed. Reg. 54715, 54715 (Sept. 11, 2015) (removing Ioflupane from schedules of the Act).

*Id.* at *10.

However, in contrast to the federal definition, New Jersey law does not exclude Ioflupane from New Jersey drug schedules. *Id.* citing, N.J. Stat. Ann. § 24:21-6(c)-(d) (2008); citing and quoting, *State v. Cathcart*, 589 A.2d 193, 197 (N.J. Super. Ct. App. Div. 1991) ("[A]ll forms of cocaine are prohibited by statute."); *Martinez v. Att'y Gen*., 906 F.3d 281, 287 (3d Cir. 2018) ("To be sure, the New Jersey statute criminalizes any derivative of coca leaves. And federal law currently exempts [123 I]Ioflupane, a derivative of coca leaves, from the lists." (citations omitted)). Thus, because New Jersey's statute sweeps broader than does the Guidelines, Mr. Scott's state conviction was held not to qualify as a predicate offense under section 2K2.1(a)(2) of the Guidelines. *Id.* Notably, the New Jersey District Court recognized that its determination in *Scott*, "leads to the outcome that **prior felony convictions involving crack cocaine in New Jersey cannot qualify as predicate controlled substance offenses**. *Id.* at 11. (emphasis supplied).

Recently, the same New Jersey judge disqualified prior New Jersey felony convictions involving heroin as a valid Guidelines predicate. In *United States v. Pete Manning*, No. 20-cr-105-1 (MAS) (D.N.J. Apr. 20, 2022), Judge Shipp declined to find the defendant a career offender under U.S.S.G. §4B1.1 based on two prior New Jersey felonies involving heroin. (*See* Sentencing Transcript ("Tr.") attached as Exhibit L). In doing so, the court first adopted it's holding in *Scott*, that the definition of "controlled substance" was defined by federal law (Tr. 7). After applying the modified categorical approach, and reviewing the Shepard documents, which confirmed the defendant's state conviction involved heroin (Tr. 9), the judge concluded that New Jersey law defines heroin more broadly than does federal law. *Id.*

> **The New Jersey statute defines heroin to include its salts, isomers, and salts of isomers,** unless specifically excepted, whenever the existence of such salts, isomers, or salts of isomers is possible within specific chemical designations. NJ Stat. Ann.

24:21-5(d)&(d)(11). **The federal schedule includes only heroin and its optical isomer.** See 21 CFR § 1308.02 (citing 21 USC § 802(6)); 21 CFR § 802(14)("isomer" means the optical isomer); *United States v. Ammar*, 714 F.2d 238, 262 (3d Cir. 1983)("The Code of Federal Regulations defines 'isomer' as 'the optical isomer' for all but specified substances...[w]e do not understand the government to dispute [defendant's] claim that heroin as referred to in Schedule I of the criminal statute is limited to heroin or its optical isomer." (citing 21 CFR § 1308.02)).

*Id.* at 9-10. Based on this conclusion, Judge Shipp held the defendant's prior New Jersey conviction for distribution of heroin "was not a proper predicate offense under Section 4B1.1." *Id.* at 11.

In light of the recent change of law, and under the modified categorical approach, none of Mr. Gill's three prior New Jersey felony drug convictions now qualify as valid predicates for applying the Career Offender guideline because the New Jersey statutes at issue are broader than their federal counterparts. In sentencing Mr. Gill to 224 months' imprisonment ( Dkt. 88 at 3), this Court adopted the PSR's determination that Mr. Gill was a Career Offender, within the meaning of § 4B1.1 of the guidelines, who also was convicted of 18 U.S.C. § 924(c). PSR ¶ 86. The PSR referenced Mr. Gill's three prior New Jersey felony convictions involving drugs to classify him as a Career Offender (PSR ¶ 62), specifically citing to his two convictions for Distribution of a Controlled Substance on School Property in the Third Degree in Passaic County Superior Court, on January 26, 1999 and June 24, 2004. PSR ¶ 48.

According to the PSR,  Mr. Gill's three prior state narcotics convictions are as follows: (1) His August 20, 2004 conviction for Possession of a Controlled Dangerous Substance with the Intent to Distribute Within 1,000 feet of School Property (Passaic County Superior Court Indictment No. 04-03-0331-I) (PSR ¶ 55) ("first prior conviction'); (2) His December 7, 2007 conviction for Possession of a Controlled Dangerous Substance with the Intent to Distribute Within 1,000 feet of School Property (Passaic County Superior Court Indictment No. 07-04-0493-I) (PSR ¶ 57) ("second

prior conviction"); and (3) His December 7, 2007 conviction for Possession with Intent to Distribute a Controlled Dangerous Substance (Passaic County Superior Court Indictment No. 07-10-0892) ("third prior conviction") (PSR ¶ 59). While the PSR does not include details of the first prior conviction (PSR ¶ 55), the case summary obtained from the New Jersey Superior Court (attached as Exhibit M), shows the drug type involved was heroin. (Exhibit M at 4-5). The PSR specifies that Mr. Gill's second prior conviction involved crack cocaine ((PSR ¶ 57), and his third prior conviction involved heroin (PSR ¶ 59).[53]

As New Jersey district courts recently have recognized, New Jersey's statutory definitions sweep broader than the federal definition, for both cocaine (*Scott*, 2021 WL 6805795 at, *10; *Martinez* 906 F.3d at 287), and for heroin. *Manning,* 20-cr-105-1 (Exh. J at 9-10).[54] Therefore, if sentenced today, the career offender guidelines would not apply to Mr. Gill. Accordingly, pursuant to the Supreme Court's decision in *Concepcion*, in deciding Mr. Gill's instant motion to reduce his sentence, we respectfully submit that this Court must consider this ameliorative change in the law as an additional reason warranting the granting of his compassionate release motion. 142 S.Ct. at 2404-05 ("Put simply, the First Step Act does not require a district court to accept a movant's argument that evidence of rehabilitation or other changes in law counsel in favor of a sentence reduction, or the Government's view that evidence of violent behavior in prison counsels against providing relief. Nor does the First Step Act require a district court to make a point-by-point rebuttal of the parties'

---

[53]Case documents for prior convictions two and three are available upon request.

[54]Additionally, as noted in *Lewis*, New Jersey's definition of marijuana also sweeps more broadly than its federal counterpart. 2021 WL 3508810, at *10.

arguments. All that is required is for a district court to demonstrate that it has considered the arguments before it.").*See also, Brunetti*, 2022 WL 92753, at *5; *Parke*, 2021 WL 4485332, at *2.

## **CONCLUSION**

Under all the facts and circumstances of the case at bar, we respectfully request that our application be granted, that Mr. Gill be resentenced to time served  pursuant to 18 U.S.C. §3582(c) and released to supervised release, or alternatively to any other reduced sentence.

Respectfully submitted,

/s/   *Randa Maher*

Randa D. Maher

cc:     All parties via ECF
        Mr. Tariq Gill - by U.S. mail

        July 31, 2022